EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* RAMÓN R. SANTOS VÁZQUEZ, acusado y apelante.

*Número:* CR-63-32 *Resuelto:* 30 de septiembre de 1963

*Carlos Sotomayor Rodríguez,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* y *Américo Serra, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

PER CURIAM: El fiscal formuló acusación contra Ramón R. Santos Vázquez, por una infracción a la Sec. 5-801 de la Ley de Vehículos y Tránsito de Puerto Rico, 9 L.P.R.A. sec. 1041, consistente en que el 10 de junio de 1961 conducía un vehículo de motor estando bajo los efectos de bebidas embriagantes. Celebrado el juicio fue declarado culpable y sentenciado a cumplir doce días de cárcel y se le suspendió la licencia de conductor por el término de un año, a tenor con lo dispuesto en la ley, 9 L.P.R.A. sec. 1042(a) y (d). En apelación, el apelante señala cinco errores.

■ Errores primero y quinto: Ambos van dirigidos a cuestionar la suficiencia de la prueba presentada en el juicio. En el primer error se argumenta que el Tribunal Superior erró al concluir que el acusado se encontraba en estado de embriaguez cuando conducía su automóvil y en el quinto error se argumenta que el tribunal erró al no concederle al acusado el beneficio de la duda razonable. No se cometieron estos errores porque el tribunal tuvo ante sí prueba suficiente para sostener la convicción. Este caso surgió con motivo de un choque entre el carro que conducía el apelante y otro vehículo. Al tomar una curva el carro que conducía el apelante le dió a otro carro por la parte izquierda trasera. En cuanto al estado del apelante en esos momentos, la siguiente es parte de la prueba que desfiló ante el tribunal:

"P. ¿Después del accidente qué sucedió?

R. Después del accidente yo me bajé del carro y fuí adonde él a decirle que viniera a ver los daños que había ocasionado al carro mío.

P. ¿Cuando usted fue adonde él dónde estaba él?

R. Estaba dentro de su carro todavía.

P. ¿Sentado en qué sitio?

R. Frente al guía.

P. ¿Al frente del volante?

R. Frente al volante.

P. ¿El carro estaba encendido o estaba apagado—el motor?

R. No le puedo decir.

P. ¿Notó usted algo en él cuando usted se acercó a él?

R. Noté que no se sentía bien.

P. ¿Cómo se veía?

R. Como en estado de atolondramiento.

P. ¿Ese estado de atolondramiento notó usted que se debiera a algo?

R. Bueno, me imagino como que estaba en estado de embriaguez.

P. ¿Cuando usted hablaba con él como hablaba él?

R. Apenas si podía entender lo que decía.

P. ¿Hablaba en forma incoherente?

R. Sí.

.    .    .    .    .    .    .    .

P. ¿Qué hizo él entonces?

R. Se bajó del carro de él y vino adonde el mío.

P. ¿Cómo caminaba él?

R. No en forma normal; como que se tambaleaba."

Además de lo antes transcrito véase la siguiente declaración del policía Felipe Acosta.

"P. ¿Cuál fue su intervención con ese ciudadano?

R. Fuí llamado para investigar un accidente en que él era una de las partes. Al iniciarse la investigación se vió que él era una de las partes en el accidente, admitido por él mismo. Cuando yo me entrevisté con él noté que expedía fuerte olor a licor y andaba dando tumbos. Lo invité a ver si se quería sacar la muestra de sangre, orina o aliento. El accedió y en el Hospital de Río Piedras el doctor Massari le tomó la muestra de sangre. Luego lo conduje a la Sala de Investigaciones y el honorable juez Valdivia lo acusó de conducir en estado de embriaguez.

P. ¿El doctor dice usted que le tomó la muestra de sangre a este señor? ¿Fue eso en presencia de usted?

R. Sí, señor.

P. ¿Y cuando usted lo entrevistó a él qué le dijo?

R. Que él era una de las partes.

P. ¿Dijo que él guiaba uno de los carros?

R. Que guiaba, sí, uno de los dos carros.

P. ¿Y dice usted que pudo notar que él estaba en aparente estado de embriaguez?

R. Sí, señor."

La primera muestra de sangre oficial dió un resultado de .15%. Ésta es la tercera alternativa que contempla la ley y en este caso se presumirá que el acusado estaba bajo los efectos de bebidas embriagantes, 9 L.P.R.A. sec. 1041(b)(3). La muestra que hizo analizar el apelante privadamente dio un resultado de .12% y la segunda muestra oficial (la que se conserva para ser analizada únicamente por instrucciones del tribunal en caso de discrepancia entre el primer análisis oficial y el análisis privado) dio un resultado de .17%.

■ Errores segundo y tercero: En el segundo error se argumenta que erró el tribunal al no declarar con lugar la solicitud de supresión de evidencia hecha en el juicio relativa a las muestras de sangre porque el requerimiento para la extracción de la sangre fue hecha por el policía Acosta quien, se alega, no tenía facultad para requerirla porque se trataba de un delito menos grave que no fue cometido en presencia del policía. El tercer error es corolario del segundo y en él se alega que erró el tribunal al admitir la prueba pericial sobre el resultado del análisis de la sangre.

No tiene razón el apelante. La Ley de Vehículos y Tránsito declara ilegal conducir un vehículo de motor mientras el conductor está bajo los efectos de bebidas embriagantes, tal como se define esa condición en la propia ley, 9 L.P.R.A. sec. 1041. A tenor con dicha ley, cuando una persona conduce un vehículo de motor en Puerto Rico ha prestado su consentimiento a someterse a un análisis químico de su sangre, aliento u orina. La persona a quien se requiera para que se someta a dicho análisis—al que ya prestó su consentimiento al conducir el vehículo—tendrá derecho a elegir entre someterse al análisis de sangre o al de orina, y de haber facilidades necesarias, también podrá escoger el examen del aliento, 9 L.P.R.A. sec. 1043(a).

Además cuando una persona es detenida porque haya motivos razonables para creer que dicha persona conducía un vehículo de motor bajo los efectos de bebidas embriagantes,

cualquier agente de orden público deberá requerir del conductor que se someta al análisis químico de su sangre, aliento u orina, según se expresó anteriormente, 9 L.P.R.A. sec. 1043(b).

En el caso de autos, habiendo sido la persona detenida con motivo de un choque, siendo él el conductor de uno de los dos vehículos envueltos en el accidente, bien podía un agente de orden público requerirle que se sometiese al examen ya que el agente podía tener motivos razonables para creer que dicha persona conducía bajo los efectos de bebidas embriagantes. Al efecto, hemos transcrito anteriormente el testimonio del agente del orden público envuelto, el policía Acosta, fragmento de su declaración que aparece en la pág. 11 de la T.E.

■ Cuarto error: Alega el apelante que el tribunal erró al concluir sobre la identidad de la muestra de sangre ya que no se probó dicha identidad. Tampoco se cometió este error. "La prueba demuestra claramente que la noche de los hechos el Dr. Ferdinand Massari le extrajo la muestra de sangre al acusado; que se preparó el parte de remisión, el cual fue firmado por el Dr. Massari; que la muestra fue dividida en tres tubos, uno de los cuales fue entregado al acusado; que el médico entregó los otros dos tubos y el parte de remisión a la enfermera de turno para ser enviados al Departamento de Salud; que los tubos estaban identificados con el número trece. Por otra parte, la química del Departamento de Salud, Olga Josefa Díaz, declaró que el día 14 de junio de 1961 se recibieron por correo en ese Departamento dos frascos identificados con el número trece conteniendo sangre, acompañados de un parte de remisión con el número trece y con el nombre del acusado y que la sangre contenida en los frascos fue analizada por ella." Véanse los siguientes fragmentos de la transcripción de evidencia. A las páginas 18 y 19, a preguntas del fiscal, el Dr. Massari contestó como sigue:

"P. Dígame ¿cuál de estos tres policías aquél a que usted se refirió?
R. Este es.

FISCAL: El testigo señala al policía Felipe Acosta, placa número 1412.

P. ¿Cuándo él vino adonde usted qué hizo?

R. Me trajo un envase para que se procediera a la extracción de la muestra de sangre de este señor. Procedí a tomársela en el antebrazo derecho porque encontré que el izquierdo era un miembro artificial. Extraje quince centímetros cúbicos y después de cerrado se le entregó uno de los tubos al acusado y los otros dos se volvieron a meter en el vaso original acompañando el parte de remisión.

P. ¿Qué identificación tenían esos tubitos?

R. Tenían el número trece.

P. ¿Luego que usted extrajo la muestra de sangre en esos tubitos qué hizo usted con ellos?

R. Luego de incluírlos en el envase original se le entregaron a la enfermera de turno.

P. ¿Y después qué se hizo con ellos?

R. Se enviaron al Departamento de Salud."

De la declaración de Olga Josefa Díaz, química del Departamento de Salud tomamos lo siguiente:

"FISCAL:

P. ¿Tendría la bondad de decirnos si recibió usted alguna muestra relacionada con el señor Ramón R. Santos Vázquez?

TESTIGO:

R. Se recibió en el Departamento de Salud dos frascos que contenían sangre, acompañados de un parte de remisión con el número 13, correspondiente al nombre de Ramón R. Santos Vázquez.

P. ¿Cómo, por qué vía se recibió todo eso?

R. Por el correo.

P. ¿Por la vía postal?

R. Sí, señor.

P. ¿Hizo usted análisis del contenido de esos frascos?

R. Sí. Se hizo un análisis cuantitativo de uno de los frascos, dando un resultado de 0.15 por ciento de alcohol por peso en la sangre.

P. ¿Ese análisis lo hizo usted misma?

R. Sí, señor.

P. ¿Puede usted decir si con posterioridad a esa fecha se hizo algún otro análisis de esa sangre?

R. Se hizo un análisis de comprobación en presencia del químico Cardona, dando un resultado de 0.17 por ciento."

En el contrainterrogatorio, a preguntas de la defensa, dicha testigo contestó como sigue:

"P. ¿A usted no le consta si la muestra que usted recibiera fuera la de la persona de Ramón R. Sánchez Vázquez?

R. Yo sé que vino un parte de remisión con el número 13, con el nombre de Ramón R. Sánchez Vázquez. La sangre tenía el número 13."

Y a la pág. 34 de la T.E. aparece el siguiente diálogo también entre la defensa y la testigo Olga Josefa Díaz.

"P. Testigo ¿es o no cierto que los tubos se identifican por el número y no por el nombre?

R. Por el número.

P. ¿Usted no puede afirmar que el número en el tubo del cual usted examinara el contenido correspondiera a este señor, al señor Ramón R. Santos Vázquez?

R. Bueno, corresponde al parte de remisión número 13, que tiene el nombre de Ramón R. Santos Vázquez.

P. ¿Y cómo puede usted asegurar que el número del tubo que usted examinara corresponde al parte de remisión?

R. Porque vino todo junto."

El apelante plantea que hay una discrepancia en el resultado de las tres muestras de sangre. Precisamente para esos casos es que la ley establece que la muestra será dividida en tres partes de manera que el tribunal tenga a su disposición la tercera parte para efectos de comprobación, 9 L.P.R.A. sec. 1043(f). Al preguntarle la defensa a la testigo Olga Josefa Díaz que a qué atribuía la diferencia en los resultados, ésta expresó lo siguiente, a la pág. 31 de la T.E.

"R. Bueno, eso depende de muchísimos factores. Puede haber el hecho de que el frasco no estuviera muy bien apretado. Llegan dos frascos; se toma uno. Si el tapón no está muy bien apretado el resultado tiene que ser menos que en el otro frasco."

Esa misma explicación dió el propio perito químico traído a juicio por la defensa. El químico Cardona expresó, a la pág. 47 de la T.E., "La discrepancia a que usted se refiere es que a medida que pasa el tiempo hay volatilización del alcohol. Eso es de sentido común. . . ." O sea, que si alguno de los tres frascos que contienen las tres muestras de sangre no está herméticamente tapado el alcohol se evapora y como es posible que eso ocurra en más de un frasco, en distinta cantidad, por eso las muestras con frecuencia no dan un resultado exactamente igual las tres. De todas maneras, esta eventualidad a quien siempre beneficia es al acusado porque obviamente mientras más alcohol se evapore más bajo es el por ciento que el análisis químico ha de acusar.

■ Los errores señalados no se cometieron. La prueba de cargo, al ser creída por el tribunal de instancia, como en efecto lo fue, justifica ampliamente la convicción. No habiéndose demostrado que el tribunal de instancia incurriese en manifiesto error, prejuicio o parcialidad y habida cuenta de la oportunidad que tuvo dicho tribunal para juzgar la credibilidad de los testigos no intervendremos con su apreciación de la prueba. *Pueblo* v. *Vélez Ruiz*, 89 D.P.R. 53 (1963); *Pueblo* v. *López Rodríguez*, 88 D.P.R. 474 (1963); *Pueblo* v. *De Jesús Marrero*, 88 D.P.R. 154 (1963).

*Se confirmará la sentencia dictada por el Tribunal Superior, Sala de San Juan, en este caso en 11 de diciembre de 1961.*